**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**RANDALL CARLEY,**

      **Plaintiff,**

**v.**                                  **Case No.: 3:16-cv-10034**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 9, 10).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, (ECF No. 9); the Commissioner's motion for judgment on the pleadings be **GRANTED**, (ECF No. 10); and this case be **DISMISSED**,

**with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On June 19, 2013, Plaintiff Randall Carley ("Claimant") protectively filed an application for DIB, alleging a disability onset date of May 19, 2013, due to two heart attacks, high blood pressure, high cholesterol, being a "slow learner," scoliosis, depression, and "nerve problems." (Tr. at 204-05, 235). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 112-16, 120-22). Claimant filed a request for an administrative hearing that was held on June 5, 2015 before the Honorable Paul Gaughen, Administrative Law Judge ("ALJ "). (Tr. at 38-69). By written decision dated July 20, 2015, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 16-37). The ALJ's decision became the final decision of the Commissioner on September 21, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 9), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 10). Claimant filed a reply brief and amended reply brief. (ECF Nos. 11, 12). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 42 years old on his alleged disability onset date and 44 years old on the date of the ALJ's written decision. (Tr. at 30). He communicates in English and discontinued school in the eighth grade. (Tr. at 47, 234, 304). Claimant previously worked

as a furniture delivery driver and loader/unloader and a maintenance worker. (Tr. at 62).

### III.  Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and

the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2018. (Tr. at 21, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 19, 2013, his alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "coronary artery disease (CAD) status post myocardial infraction and stent placement with high blood pressure; lumbar degenerative disc disease (DDD) and degenerative joint disease (DJD); chronic obstructive pulmonary disease (COPD); borderline intellectual functioning (BIF)/learning disorder; and affective disorder." (Tr. at 21-22, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-24, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant cannot keep up with fast-paced production demands; cannot work at unprotected heights or in environments with mechanical devices or industrial noise near the work area; can less than occasionally perform postural adjustments, but while on the feet he could bend, stoop, crouch, or kneel as needed; cannot use foot controls or do commercial driving; and can lift and handle more than 20 pounds occasionally, but not more than 35 or 40 pounds. Additionally, the claimant can read and write lists and simple tasks; can do simple math

tasks; he is literate and reads at a grade four or five level; can learn and apply to work simple clear instructions of no more than three or four simple steps to be learned and put to use; and can get along with coworkers and the retail public, but is limited to routine and perfunctory social interactions.

(Tr. at 24-30, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work (Tr. at 30, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 30-31, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the alleged disability onset date (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 30-31, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 31, Finding No. 10). At the sedentary exertional level, Claimant could perform unskilled work as a sorter, table worker, or final assembler. (*Id*). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 32, Finding No. 11).

## IV.  **Claimant's Challenges to the Commissioner's Decision**

In his single challenge to the Commissioner's decision, Claimant argues that the ALJ improperly determined that his cognitive functioning did not meet or equal Listing 12.05C when he had a valid verbal IQ score of 70, numerous severe impairments causing significant work-related limitation of functioning, and adaptive deficits that manifested in his developmental years. (ECF No. 9 at 6-12).

In response, the Commissioner argues that Claimant had not proven that he is disabled under the Act and, although he had a valid verbal comprehension score of 70, no medical evidence established a diagnosis of intellectual disability beyond borderline intellectual functioning. (ECF No. 10 at 11-12). The Commissioner asserts that contrary to Claimant's assertion, Claimant does not demonstrate the necessary deficits in adaptive functioning to satisfy Listing 12.05C. (*Id.* at 12-14).

In his amended reply brief, Claimant notes that the Commissioner's response concedes that Claimant has a valid verbal IQ score within the required range of Listing 12.05C. (ECF No. 12 at 1). Further, as to the Commissioner's point that Claimant was diagnosed with borderline intellectual functioning instead of intellectual disability, Claimant states that a diagnosis of intellectual disability is not required by the listing. (*Id.* at 1-2). Claimant points out that the mental impairment listing promulgated by the SSA is different than the Diagnostic and Statistical Manual of Mental Disorders ("DSM") used by practitioners in a clinical setting; in fact, the Commissioner rejected a proposal that the DSM's definition be used for Listing 12.05C. (*Id.* at 1-2). As to his deficits in adaptive functioning, Claimant states that he was only able to work with accommodation and assistance from others, which fails to demonstrate that he did not have deficits in adaptive functioning. (*Id.* at 2). Further, Claimant states that the ALJ relied almost exclusively on "check-box function reports" to undermine Claimant's adaptive functioning deficits without considering the context of such responses. (*Id.* at 2-3).

## V.   **Relevant History**

The undersigned has reviewed all of the evidence before the Court, including Claimant's statements, education and health care records, and evaluations. The information that is most relevant to Claimant's challenge is summarized as follows.

### A.    Claimant's Statements

Claimant completed a function report on June 30, 2013. He noted that he lived in a home with his wife and children and his daily activities included watching television twice per day, sometimes sitting on the porch, lying in bed, and showering. (Tr. at 246-47, 250). However, he also helped care for his children by preparing bottles and snacks. (*Id.*). He stated that his wife helped him make sure that the kids were given "what they need." (*Id.*). He had no problems with personal care and required no reminders to care for himself, although he required reminders to take his medication. (Tr. at 247-48). He prepared sandwiches and cereal "ever[y] now and then." (Tr. at 248). He could "clean a little and do a little laundry" and did not require help or encouragement doing such chores. (*Id.*). He drove a car and could go out alone, including shopping for groceries weekly. (Tr. at 249). He could pay bills, count change, and use money orders, but could not handle a savings account or use a check book because he did not "read or write ver[y] good." (*Id.*). He went to his in-laws' home and church every week without anyone accompanying him. (Tr. at 250). He had no problems getting along with family, friends, and neighbors and had no changes in social activities. (Tr. at 251). He reported that he was "very forgetful of things [that he was] doing or saying." (Tr. at 246, 251). He could pay attention for 10 minutes and had trouble reading, but could follow spoken instructions "pretty good." (Tr. at 251).

Claimant completed another function report on May 16, 2014 in which he stated that he was prevented from working due to physical conditions. (Tr. at 276). On a daily basis, he took his medicine, watched television for a total of three hours, ate, and took naps. (Tr. at 277, 280). He again stated that he also cared for his son and daughter. (*Id.*). He had no problems with personal care and did not require reminders to take care of his

personal needs and grooming, although he needed reminders to take his medications. (Tr. at 277-78). He prepared a sandwich or microwaved a frozen dinner "about once a week" and prepared coffee. (Tr. at 278). He mowed the grass and folded laundry with his wife's help, noting that he could not "do it [himself] anymore." (*Id.*). He grocery shopped for food, including bread, cereal, and microwaveable dinners. (Tr. at 279). He could count change, but could not pay bills, handle a savings account, or use a check book because he could not read or understand most words. (*Id.*). He went to his mother-in-law and aunt's houses and talked to them once a week. (Tr. at 280). He noted that he had issues with memory, confusion, inability to concentrate, understanding or following instructions, and had "bad nerves" around other people. (Tr. at 281). He could not pay attention for a long time and could not follow instructions because he had trouble understanding and forgot what he was told. (*Id.*).

During the administrative hearing on June 5, 2015, Claimant testified that he stopped working in May 2013 because he suffered a heart attack. (Tr. at 44). As to his mental impairments, he stated that he "cannot comprehend anything [that] anybody is telling [him]." (Tr. at 46-47). He had that problem before the heart attack, but it became worse. (Tr. at 47). He went to school until the eighth grade and people picked on him because he "could not read and write." (*Id.*). He said that he could spell some words like his name, but not others, including the words "cheese" and "bread." (Tr. at 48, 59). He testified that he cannot not count change; Claimant gave his money to his co-workers at lunch time and they would pay and give him his change. (Tr. at 49, 56). He also testified that he did not manage money; he simply cashed his checks and gave the money to his wife. (Tr. at 56). His wife likewise completed his social security forms for him. (Tr. at 57).

Claimant testified that he received mostly failing grades in school and dropped out

of school when he was approximately 19 years old, but was still in the seventh or eighth grade. (Tr. at 49-50). He was 25 when he had his first girlfriend and was married five times, noting that he was hard to live with and grouchy. (*Id.*). He only lived alone for a total of two or three weeks while he was in his 20s. (Tr. at 51). He stated that he was unable to care for himself while living alone, including forgetting to put detergent in the washing machine and being unable to prepare anything other than simple meals like sandwiches. (*Id.*). Claimant stated that since his mom passed away, he went from girlfriend to girlfriend who made sure that his needs were met. (*Id.*). On a daily basis, he watches television, but does not take care of the kids or the home; his wife handles those responsibilities. (*Id.*). He can grocery shop, but has to write his own lists because he cannot read what others write. (Tr. at 59). He draws pictures or spells things "his way" even if it is incorrect. (*Id.*).

Claimant testified that he obtained his driver's license when a retiring state trooper, who had given him a number of tickets, offered to help him pass the driver's test. (Tr. at 53). He claims that the person gave him the test orally and increased the volume of his voice when reading the correct answer, which allowed Claimant to pass the test. (Tr. at 54). Claimant reported that he has trouble driving if someone speaks to him because he cannot do two things at once. (*Id.*). He also does not know the meaning of some road signs. (Tr. at 56). In his prior employment for a furniture store, he loaded and unloaded furniture and drove the truck to local places. (Tr. at 60). He experienced trouble at work because he would forget where he went, what he had done, where he was going, or where he put something. (Tr. at 55). He could not assemble furniture without a picture. (*Id.*). His co-workers assisted him at work by reading directions and driving the truck to unfamiliar places so that all he had to do was ride with them and carry furniture inside.

(Tr. at 56). He also previously worked as a maintenance worker in which he made plumbing repairs and mowed grass. (Tr. at 60-61).

### B. School Records

Claimant attended public school in Wayne County, West Virginia in regular education courses. (Tr. at 236, 304-05). He repeated the first and fourth grades and, according to his educational record in the file, only attended school through the seventh grade. (Tr. at 304-05). He received numerous failing grades, but obtained satisfactory grades in all of his subjects in the second grade, including in the subjects of reading and writing. (Tr. at 304). In the third grade, he received "Bs" in reading and writing; in the fifth grade, he received a "B" in writing, but failed reading; and in the sixth grade, he received "Cs" in reading and writing. (*Id.*). He consistently received failing grades in the subject of spelling. (*Id.*). He nearly failed his seventh grade year; however, he was absent from school more than he was present that year. (Tr. at 305). In fact, he exceeded 68 absences every year that he was in school and was absent equally as much or more than he was present during his first and fourth grade years, which were the grade levels that he repeated. (Tr. at 304).

### C. Evaluations and Opinion Evidence

On October 9, 2013, licensed psychologist Emily E. Wilson, M.A., performed a Neuropsychological Screen Profile of Claimant, which included a clinical interview, mental status examination, Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV) test, and a Cognistat 2013 test. (Tr. at 418). Claimant reported that he was seeking disability benefits due to dizzy spells when walking long distances and because of his two heart attacks. (*Id.*). He had a current driver's license and drove himself to the evaluation. (Tr. at 418-19). He presently resided with his wife and two children. (*Id.*). Claimant

completed a two-page intake form; however, he left many questions blank, reporting that he had difficulty reading and writing. (Tr. at 419). He identified that he worked as a driver and laborer for a furniture store from January 1997 to May 2013. (*Id.*). He stated that he did not supervise others or complete paperwork in that job and someone had to assist him in making deliveries because he could not read directions. (Tr. At 420). As to his educational history, he reported that he completed the ninth grade and attended one day of the tenth grade before dropping out of school; he repeated the first and seventh grades; and he received poor grades, but did not receive special education services. (Tr. at 420). He was married for 17 years to a woman with whom he had one son and was now re-married to his second wife for approximately one year with whom he had an infant. (*Id.*). He reported performing most activities of daily living fairly independently, including personal grooming and hygiene. (*Id.*). He could only do light chores due to physical limitations. (*Id.*). He cooked simple meals, such as fixing a sandwich, and he drove, but did not shop or handle finances. (*Id.*). On a typical day, he drove to the post office and sometimes performed some household chores or yard work. (Tr. at 421).

On the WAIS-IV, Claimant's lowest IQ scores included his verbal comprehension score of 70, processing speed score of 65, and a full scale score of 71. (Tr. at 421). His General Ability Index (GAI) score was 77.[1] His results were considered valid because he appeared motivated, exhibited adequate effort, and rapport was established. (*Id.*). There was no need to repeat questions to him. (*Id.*). On the Cognistat 2013 test, Claimant showed mild impairment in attention, memory, and similarities. (Tr. at 421-22). His scores on that test were otherwise in the average range. (*Id.*). His Cognistat scores were

---

[1] "The GAI is a composite score that is based on 3 Verbal Comprehension and 3 Perceptual Reasoning subtests, and does not include the Working Memory or Processing Speed subtests included in the Full Scale IQ." http://images.pearsonclinical.com/images/Assets/WISC-IV/80720_WISCIV_Hr_r4.pdf

likewise considered to be valid. (Tr. at 422). On his mental status examination, Claimant was cooperative, but his insight appeared mildly deficient; his judgment appeared within the low average range; and his remote memory, concentration, social functioning, and pace during the examination were mildly deficient. (*Id.*). Ms. Wilson diagnosed Claimant with borderline intellectual functioning based on his full scale IQ score of 71, his GAI score of 77, his report of academic problems in school, his difficulty reading and writing, and his work history. (Tr. at 422-23). She stated that if Claimant was provided benefits, he would benefit from a payee to help him manage his resources. (Tr. at 423).

On October 22, 2013, Holly Cloonan, Ph.D., reviewed Claimant's records, including his consultative examination, and concluded that Claimant had a secondary diagnosis of borderline intellectual functioning. (Tr. at 86). She adjudged that Claimant had mild restriction in activities of daily living and moderate restrictions in maintaining social functioning and concentration, persistence, or pace, but he did not have any episodes of decompensation of extended duration. (Tr. at 87). Ms. Cloonan noted that Claimant's educational and vocational histories and descriptions of his adaptive behavior functioning was consistent with borderline intellectual functioning. (*Id.*). She further noted that his reported limitations in activities of daily living appeared to be mainly associated with pain from his physical condition. (*Id.*). She found him to be fully credible and concurred that some of his mental functional capabilities were moderately limited. (Tr. at 88).

Ms. Cloonan also completed a Mental RFC assessment form. She found that Claimant was not significantly limited in remembering locations and work-like procedures; understanding, remembering, and carrying out very short simple instructions; performing activities within a schedule, maintaining regular attendance,

and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (Tr. at 90-91). He was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). Ms. Cloonan found that Claimant had no adaptation limitations. (Tr. at 92). Overall, she stated that he was able to learn, remember, and perform routine work-like activities involving simple instructions in settings that do not require meeting production line schedules or more than occasional interactions with coworkers and the general public. (*Id.*). Jeff Harlow, Ph.D., affirmed Ms. Cloonan's assessment on February 22, 2014. (Tr. at 101-03, 105-07).

On July 27, 2015, Rhonda Crawford, APRN, completed a questionnaire, noting that she saw Claimant on June 7, 2015 for chronic low back pain, knee pain, anxiety, and the need for a psychiatry referral. (Tr. at 594). She checked a box stating that Claimant was "forgetful," but she did not check the box stating that Claimant had "difficulty concentrating." (*Id.*). She opined that his prognosis was good. (*Id.*). However, she stated that Claimant's pain was severe enough to often (defined as up to 1/3 of 8 hours) interfere with his attention and concentration. (Tr. at 595).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

Claimant contends that the ALJ improperly determined that his cognitive functioning did not meet or equal Listing 12.05C. (ECF No. 9 at 6). A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 416.925. The

Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; therefore, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). However, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to Mental Disorders, which in 2015 were arranged in nine diagnostic categories, including listing 12.05 (Intellectual Disability[2]). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.*

Therefore, to qualify for intellectual disability under listing 12.05C, which is often referred to as the listing for "mild mental retardation," Claimant must establish that he has an intellectual impairment that satisfies both the *diagnostic description* of intellectual disability and the *severity criteria* set forth in paragraph C. The diagnostic

---

[2] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed.Reg. 46,499–46,501 (Aug. 1, 2013). However, this change "does not affect the actual medical definition of the disorder or available programs or service," *Id.* at 46,500. Moreover, the structure of the listing, its diagnostic description, and its severity criteria were unchanged.

description of intellectual disability, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria of paragraph C, which constitute the next two prongs of the listing, include: "a valid verbal, performance, or full scale IQ of 60 through 70" and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

While intellectual functioning can be measured, in part, by standardized intellectual quotient (or "IQ") testing, the first prong of Listing 12.05, "[a]daptive functioning refers to more than simply an IQ score or grades in school." *Dearry v. Astrue*, No. 2:11CV00027, 2012 WL 1165332, at *5 (W.D. Va. Apr. 9, 2012); *Salmons v. Astrue*, No. 5:10CV195-RLV, 2012 WL 1884485, at *2 (W.D.N.C. May 23, 2012). Rather, "[a]daptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id.* (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th Ed.1994). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia,* 536 U.S. 304, 309 n. 3 (2002)); *Hinkle v. Comm'r Of Soc. Sec.*, No. 3:14-CV-41, 2015 WL 2170034, at *6 (N.D.W. Va. May 8, 2015).

As many courts have recognized, Listing 12.05C "does not expressly define 'deficits

in adaptive functioning.'" *Rothrock v. Colvin*, No. 1:13CV497, 2016 WL 1175189, at *6 (M.D.N.C. Mar. 23, 2016). Nonetheless, "[c]ourts in the Fourth Circuit have found that a claimant's illiteracy, failure to graduate from high school, enrollment in special education classes, and poor grades are all important when reviewing whether a claimant has deficits in adaptive functioning in academic skills." *Hinkle*, 2015 WL 2170034, at *24 (citing *Herron v. Astrue,* No. 5:12−CV−44, 2012 WL 4747270, at *10 (N.D.W. Va. Aug. 24, 2012) (collecting cases). Because intellectual disability is a lifelong condition, a claimant must show that the deficits in adaptive functioning manifested during the formative years, predating age twenty-two. *Herron*, 2012 WL 4747270, at *9 (citing *Luckey v. U .S. Dept. of Health and Human Svcs.,* 890 F.2d 666, 668 (4th Cir. 1989)). Whether a claimant's adaptive deficits satisfy Prong 1 is necessarily "a fact-specific inquiry and must be determined on a case-by-case basis." *Odoms v. Colvin*, 194 F.Supp.3d 415, 422−23 (W.D.N.C. 2016) (citation omitted). "Thus, although cases interpreting Listing 12.05 provide some guidance, the factors that will satisfy this prong are unique to each case" and there are few bright-line rules. *Id.*

In this matter, the ALJ found at step two that Claimant had numerous severe impairments, which included "borderline intellectual functioning (BIF)/learning disorder." (Tr. at 21). At step three, the ALJ evaluated whether Claimant's impairment or combination of impairments met or medically equaled the criteria set forth in Listing 12.05. (Tr. at 24). As relevant to Claimant's challenge, the ALJ found that Claimant did not satisfy either prong of Listing 12.05C because Claimant did not (1) demonstrate the requisite deficits in adaptive functioning or (2) have a valid IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. (*Id.*). The Commissioner does not challenge Claimant's

assertion that he meets the second prong of Listing 12.05C by virtue of his verbal comprehension IQ score of 70 and other severe impairments. (ECF No. 10); *see Luckey v. Dept. of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989) (holding that a claimant satisfies the second prong of 12.05C if the claimant has an additional severe impairment or cannot perform his past relevant work). However, the Commissioner maintains that the ALJ properly found that Claimant fails to meet the diagnostic description of Listing 12.05C, which requires significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period. (*Id.*).

Consequently, the sole inquiry before the Court is whether the ALJ's decision as to Claimant's adaptive functioning is supported by substantial evidence. Notwithstanding any alleged error as to whether Claimant had a valid IQ score that met the listing, the ALJ's decision should only be remanded if the ALJ incorrectly found that Claimant did not meet the diagnostic definition of Listing 12.05C. *Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012) ("As previously noted, Hancock can prevail only if she establishes that the ALJ erred in his analysis of Prong 1 and Prong 2. Therefore, even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence."); *Dearry*, 2012 WL 1165332, at *5 ("The plain language of the regulation provides that to satisfy the listing requirements, an impairment must meet *both* the introductory requirement *and* the additional requirements outlined in the particular sections [...] The key question in this case is whether the evidence shows that Dearry has had deficits in adaptive functioning manifesting before the age of 22.") (collecting cases).

The ALJ found that although Claimant received a valid verbal comprehension IQ score of 70, his full scale IQ score was slightly higher at 71, and "section 12.00(D)(6)(e) of the listings provides that the best indicator of severity is often the level of adaptive functioning and how activities of daily living and social functioning are performed." (Tr. at 24). The ALJ concluded that Claimant did not show the deficits in adaptive functioning required by Listing 12.05C, noting that Claimant performed many activities of daily living, such as accomplishing his own personal care, and he had performed well at manual labor jobs for many years. (*Id.*). In addition, the ALJ cited Claimant's 2013 function report, which confirmed that Claimant could follow spoken instructions, count change, and manage money orders. (*Id.*).

Later in the decision, the ALJ recognized Claimant's hearing testimony that he struggled to comprehend what others told him. (Tr. at 25); *see Finley v. Astrue*, No. 5:08-CV-209-D(1), 2009 WL 2489264, at *5 (E.D.N.C. Aug. 13, 2009) ("[T]he ALJ's decision may appropriately be read 'as a whole.'"). The ALJ noted that Claimant quit school in the seventh or eighth grade when he was 18 or 19 years old and stated that he skipped school because others picked on him. (*Id.*). The ALJ further acknowledged Claimant's statements that he could not read or write in school, he could not count change, and he could spell some words, such as his name, but could not spell the word "cheese." (*Id.*). As stated by the ALJ, Claimant reported that he had been married five times and only lived alone for approximately two weeks; he could not do laundry or cook meals, but could prepare simple food; and, during the day, he watches television and walks around the house, but does not perform chores or childcare. (*Id.*). The ALJ noted that Claimant claimed that he received his driver's license with assistance after receiving several tickets and he cannot concentrate on more than one thing while driving, which contributed to

several motor vehicle accidents. (*Id*.). Finally, the ALJ acknowledged Claimant's reports that had trouble following directions at his job moving furniture and his wife completed his social security disability forms for him. (*Id*.).

However, the ALJ emphasized that Claimant also completed function reports in June 2013 and May 2014, which described a higher level of adaptive functioning. Among other things, Claimant reported that he helped care for his son and daughter and had no problems with personal care chores. (Tr. at 26). He talked with other people approximately once per week. (*Id*.). He stated that he shopped in stores and *could* count change and do money orders. (*Id*.) Moreover, the ALJ pointed out that in Claimant's initial function report, he stated that he could not pay bills, but in his later report, he stated that he could do so. (*Id*.). In addition, Claimant indicated that he was "pretty good" at following spoken instructions, and, in his later report, he also identified that he performed some light household chores and drove. (*Id*.).

The ALJ acknowledged Claimant's "learning difficulties in school with a rural upbringing" and his education records showing mostly failing grades. (Tr. at 28). The ALJ also considered and gave weight to Claimant's consultative examination and the reports of the state psychologists who all considered Claimant's testing, educational and vocational history, and reported adaptive behavior; they collectively found that Claimant had borderline intellectual functioning and could work with certain mental restrictions. (Tr. at 29, 30). Overall, the ALJ concluded that Claimant's statements regarding the severity of his intellectual deficits were not fully credible.

The ALJ found that Claimant demonstrated a good ability to independently initiate and sustain a wide range of activities. Furthermore, Claimant conceded that it was his physical limitations, not his mental deficiencies, which restricted his activities of daily

living. (Tr. at 29). The ALJ reviewed Claimant's various daily activities and abilities and determined that he was only mildly limited in that functional area.

As to Claimant's social functioning, the ALJ noted that despite Claimant's allegations that he has difficulty being around others, he had friends, maintained meaningful relationships, and got along fine with authority figures. (*Id.*). Claimant talked to others once per week; shopped in stores; went to the post office, church, and family events. (*Id.*). His doctors described him as cooperative and pleasant and he did not demonstrate difficulty interacting and responding to questions during the hearing. (*Id.*). Further, the ALJ found that Claimant performed activities that suggested good concentration and persistence, such as watching television, performing personal care, and other cited activities.

Upon review of the decision and the entire record, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence. Clearly, the ALJ recognized that Claimant's records and testimony demonstrated some cognitive limitation. However, the ALJ weighed and evaluated all of the information, including Claimant's statements, educational and vocational history, and the opinion evidence, and reconciled the inconsistencies. The ALJ ultimately concluded based on his analysis of the evidence that Claimant suffered from borderline intellectual functioning/learning disorder as opposed to intellectual disability.

Importantly, the ALJ thoroughly considered Claimant's school records and his claimed illiteracy. As noted, these are key considerations in evaluating whether an individual had deficits in adaptive functioning that manifested during the developmental period. The ALJ recognized that Claimant quit school in seventh or eighth grade at the age of 18 or 19, he had "learning difficulties in school with a rural upbringing"; and his

education records showing mostly failing grades. The ALJ also noted Claimant's allegation that he could not read and write in school, could not count change, and could not complete his disability forms. However, the ALJ found that such limitations were countered by evidence that Claimant was frequently absent from school, performed well in his employment, and independently performed many activities of daily living.

Claimant's school records, which were examined by the ALJ, support the ALJ's findings. (Tr. at 48). Although Claimant repeated the first and fourth grades and performed very poorly in many classes, he received satisfactory grades in reading and writing in the second grade; "Bs" in reading and writing in the third grade; and "Cs" in reading and writing in the sixth grade. (Tr. at 304). Claimant concedes that he was never in special education classes. (Tr. at 236). Also, he had markedly poor attendance in school, which undoubtedly impacted his performance. (Tr. at 49); *see, e.g., Byrd v. Astrue*, No. 5:11CV48, 2012 WL 293304, at *4 (N.D.W. Va. Feb. 1, 2012) (noting that "[a]lthough the plaintiff earned below average grades in high school, the ALJ note[d] that he was frequently absent from school.").

The ALJ also correctly considered, but did not rely exclusively on, Claimant's work history in evaluating his adaptive functioning. *Cook v. Colvin*, No. 2:13-CV-20573, 2015 WL 627856, at *16 (S.D.W. Va. Feb. 9, 2015) ("[W]ork history is one factor to examine when looking for deficits in adaptive functioning that manifested in the developmental period [...] Not only is the type of work performed by Claimant important, but his work record in general should be examined."); *Hancock,* 667 F.3d at 475–76 (The ALJ's consideration that Claimant worked several jobs, in addition to performing a variety of tasks, was sufficient evidence to support the ALJ's finding that the claimant did not have deficits in adaptive functioning). As noted by the ALJ, Claimant successfully worked as a

furniture delivery laborer and driver for 16 years. The vocational expert testified that such job was a semi-skilled position as Claimant actually performed it. (Tr. at 62). *See Cook*, 2015 WL 627856, at *16 (citing *Weedon v. Astrue,* No. 11–2971–DCN–PJG, 2013 WL 1315311, at *7 (D.S.C. Jan. 31, 2013) (Claimant's past ability to perform skilled or semi-skilled work is evidence that he lacks deficits in adaptive functioning); *Linaburg v. Comm'r of Soc. Sec.*, No. 1:13CV177, 2014 WL 3101449, at *9 (N.D.W. Va. July 7, 2014) ("Listing 12.05C assumes the ability to work at *unskilled* jobs.") (emphasis added). Claimant testified that he quit his job because he had a heart attack which caused various physical limitations. (Tr. at 44). While Claimant stated that he had trouble following directions at work and relied on assistance of his co-workers, he does not assert that mental limitations prevented him from performing his job. (Tr. at 55-56). His work history certainly lends credence to the ALJ's finding that Claimant lacked the requisite deficits in adaptive functioning.

Additionally, as cited by the ALJ, Claimant's function reports completed in June 2013 and May 2014 indicate that his adaptive functioning is not as limited as he suggested. He reported that he had no issues with self-care; helped care for his children by preparing bottles and snacks; prepared simple meals such as sandwiches; performed some chores; shopped for groceries weekly at a reasonable pace; could pay bills, count change, and use money orders; socialized at his in-laws' home and church weekly without anyone accompanying him; spent his time watching television; had a driver's license and drove a car; and had no problem getting along with his family, friends, and neighbors. (Tr. at 247-49, 277-80).

Further, the ALJ's finding as to Claimant's cognitive impairments is consistent with all of the opinion evidence in the file. Licensed psychologist Ms. Wilson performed a

battery of psychological tests on Claimant in October 2013. In fact, Ms. Wilson's IQ testing garnered the single IQ score on which Claimant bases his claim that he meets Listing 12.05C. However, despite the verbal IQ score of 70, Ms. Wilson very clearly opined that Claimant suffered from borderline intellectual functioning, not intellectual disability. (Tr. at 422); *see Adkins v. Astrue*, No. 2:10-CV-00226, 2011 WL 560497, at *4 (S.D.W. Va. Feb. 8, 2011) (Noting that despite the claimant's valid IQ score of 69 during his consultative examination, the examining psychologist diagnosed him with borderline intellectual functioning, not mild mental retardation.) Ms. Wilson based the diagnosis of borderline intellectual functioning on Claimant's full scale IQ of 71, his GAI of 77, and his reported academic problems in school, difficulty reading and writing, and work history. (Tr. at 423). Likewise, the state psychologists found that Claimant's educational and vocational histories and descriptions of his adaptive behavior were consistent with borderline intellectual functioning, not intellectual disability. (Tr. at 86-87, 101-02). They agreed that Claimant could work with certain mental and social limitations. (Tr. at 92, 107).

There is indeed not a single record or opinion in the file diagnosing Claimant with intellectual disability. Although such a diagnosis or opinion is not required, the fact that all experts agree that Claimant suffered from borderline intellectual functioning, as opposed to intellectual disability, supports the ALJ's step three determination. *Tyre v. Colvin*, No. 8:14-CV-03426-JDA, 2016 WL 519168, at *12 (D.S.C. Feb. 10, 2016) (A "claimant's diagnosis, if there is one, is pertinent: when a claimant has been diagnosed as mildly mentally retarded in a Listing 12.05C case, courts are more likely to affirm a finding of deficits in adaptive functioning prior to age 22 than if the claimant has the lesser diagnosis of borderline intellectual functioning."); *Salmons*, 2012 WL 1884485, at *5.

In summary, the Court must not reweigh conflicting evidence or substitute its' judgment for that of the ALJ and it  must sustain the ALJ's decision, even if the Court disagrees with it, provided the determination is supported by substantial evidence. *Hancock,* 667 F.3d at 476 (citations omitted). Here, the ALJ considered all of the pertinent information and articulated a well-reasoned decision that Claimant did not meet Listing 12.05C, which is supported by substantial evidence. Therefore, it is not within the province of the Court to disturb the ALJ's findings. *See generally Tyre*, 2016 WL 519168, at *14 ("Because the ALJ considered pertinent evidence and weighed appropriate factors in analyzing whether Plaintiff met the introductory requirements of Listing 12.05C, the Court cannot say that the ALJ's determination—that Plaintiff did not demonstrate the requisite deficits in adaptive functioning—was not supported by substantial evidence or was controlled by error of law. The fact that Plaintiff can point to other evidence that supports her position does not render the ALJ's decision unsupported."); *Berry v. Astrue*, No. 2:11-CV-00134, 2012 WL 1493841, at *6 (S.D.W. Va. Apr. 27, 2012) ("The court finds that the ALJ's decision that Claimant did not meet Listing 12.05C [...] is supported by substantial evidence. All psychologists who have examined Claimant have concluded that he has borderline intellectual functioning, despite [his full scale IQ score], and Claimant operated heavy equipment in the timber industry for years, employment which requires judgment and skill [...]); *Burkhammer v. Comm'r of Soc. Sec.*, No. 1:12CV113, 2013 WL 4478105, at *8 (N.D.W. Va. Aug. 19, 2013) (Affirming ALJ's decision that the claimant did not manifest the requisite deficits in adaptive functioning where the consultative psychologist found that the claimant had borderline intellectual functioning notwithstanding his valid verbal IQ score of  69 and full scale IQ score of 71 and where Claimant's personal, educational, and vocational history included three

marriages and divorces and four children, dropping out of the school in the tenth grade, and learning difficulties, but the claimant could help care for his small children, held a valid driver's license, worked at a number of jobs, was never fired because he could not comprehend or mentally perform the work demands, and could run errands and perform other tasks). Therefore, for all of the reasons stated above, the undersigned **FINDS** that the ALJ's decision should be affirmed.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 9); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate

review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 28, 2017

Cheryl A. Eifert
United States Magistrate Judge